Estate of George Cornelius Mills, George York Mills, as Administrator of Said Estate v. Commissioner.
Estate of George Cornelius Mills v. Commissioner
Docket No. 9067.
United States Tax Court
1946 Tax Ct. Memo LEXIS 92; 5 T.C.M. (CCH) 768; T.C.M. (RIA) 46216; August 30, 1946
S. P. Cain, Esq., Cairo, Ga., for the petitioner. Edward L. Potter, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined a deficiency in estate tax in the amount of $23,959.35. Certain adjustments are not contested by petitioner. Respondent has agreed that additional administration expenses, including attorney's fees, may be allowed as a deduction under the Rule 50 computation. The only question presented is whether certain transfers of land and United States Savings Bonds made by decedent in his lifetime to his four adult children were made in contemplation of death so as to be includible in the gross estate under section 811 (c). Respondent's valuation of the property transferred *93 is not in issue. Petitioner also has abandoned his original claim that decedent's inter vivos gifts of United States Savings Bonds to the widow and minor child in the respective amounts of $375 and $1,906.50 were not includible in the gross estate. The estate tax return was filed with the collector for the district of Florida. Findings of Fact Petitioner is the duly qualified administrator of the estate of George C. Mills, who died intestate on October 21, 1943, a resident of Lamont, Florida. Decedent was born on January 25, 1873. At the time of his death in 1943 he was more than 70 years old. Death resulted two hours after decedent suffered a heart attack. Decedent's second wife and a minor child born of the second marriage, survived him. He was also survived by four adult children of his first marriage, three daughters and a son, to whom the transfers here in controversy were made. The son is the petitioner herein. Decedent was divorced from his first wife in March, 1937. Within sixty days of the divorce he remarried. The children of the first marriage were very much opposed to the second marriage. The children continued to display feelings of bitterness and hostility *94 toward the second wife up to the date of decedent's death. After the marriage, the son never spoke to his stepmother, and refused to enter decedent's home. When business reasons required the son to see decedent at home, decedent and the son would talk outside the home. Despite the hostility of the children to the second wife, the relations between decedent and the children were friendly. He continued to give them Christmas and birthday gifts, contributed to the support of two of the daughters, and entered into business transactions with the son, all of which will be developed in more detail hereinafter. On July 10, 1939, decedent visited a physician in Gadsden, Alabama, and underwent a three day physical examination. The examination disclosed that decedent had a very serious heart condition. His heart was enlarged, there was distinct evidence of muscular weakness of the heart, or myocardia insufficiency, and disease of the coronary artery, or coronary sclerosis. The physician informed decedent that he had extremely serious heart trouble. He emphasized to decedent that decedent had an incurable condition and that decedent would have to make the best of it. The physician further *95 advised decedent to decrease his physical exertion, to repress as much as possible all emotional activity and to lead a much more quiet existence. In accordance with his usual practice, the physician did not express any opinion to decedent as to how long decedent might expect to live. Decedent did not consult the physician thereafter. Decedent was a very reserved man. He kept to himself. He rarely spoke of and never complained about his health. The son knew decedent did not eat certain things because of some stomach trouble. Decedent did not tell his children or his attorney, nor did they know, that he had heart trouble or that he had gone to the physician in Gadsden. It was not until late in the summer of 1943 that the son noticed any change for the worse in decedent's physical appearance. It was then for the first time that the son found out that decedent was taking pills for his heart trouble. The son did not know whether decedent's heart condition was serious. At the time of his death and for many years prior thereto, decedent was engaged in the business of producing turpentine from timber land which he owned or leased, and of cutting timber for saw mill purposes. Although *96 decedent did no manual work, he was a very active man. From 1937 through 1940 he personally looked after the cutting of timber on the lands he owned near Lamont where he lived, and supervised the turpentine operations at Ochlocknee, some 50 miles from Lamont. The timber land near Lamont was low flat wet land. The actual cutting operations were performed by a contractor on a percentage basis, but almost every day decedent walked one to five miles on the land directing and lining up the cutting of the timber. Twice a week decedent drove by automobile to Ochlocknee to supervise the turpentine operations, a round trip of over 100 miles. Prior to his physical examination in July, 1939, and after the examination until his death, decedent did the same type of outdoor work. Although, as will be subsequently developed, the son took over the Ochlocknee turpentine operations in 1941, decedent continued to supervise the cutting of timber on the lands which he owned or gave to his daughters near Lamont. On the day before he died, decedent was directing some pulp wood cutting on the land of one of his daughters. 1. In March or April of 1939, prior to his physical examination in July, decedent *97 told a contractor who was cutting timber for him on a percentage basis that he intended to divide the land then being worked on, some 11,000 acres, between two of his daughters. Decedent showed the contractor a division line which he had had surveyed in 1938. Decedent also told the contractor that it would be to decedent's and the contractor's financial advantage for the contractor to cut as much timber as possible by the end of the year 1939, since decedent would not own the lands thereafter. The contractor continued to cut timber for decedent until the end of 1939. He also cut timber for the daughters for about 30 to 45 days in 1940 after some of the gifts here in controversy were made. In the summer of 1938 decedent directed his son-in-law to have surveyed the division line which he later showed to the contractor. At the time of the surveyance, decedent told the son-in-law that he intended to give to two of his daughters, one of whom was the son-in-law's wife, the land which was then being surveyed. In the spring of 1938, decedent informed his son that he intended to divide certain land among the children after he finished cutting the timber on it. Decedent told the son further *98 that the deeds would be so worded that neither the son nor the daughters could sell the land during their lifetime. In the early part of 1938 decedent discussed with his attorney his intention to give to his children the land in controversy. Decedent informed the attorney that he wanted the children to have the income from the land during their lifetime, and that, at their death, the land was to go to the children's heirs. Decedent discussed these transfers with the attorney at least six times. The discussions always took place in the attorney's office, about 25 miles from decedent's home. During July or August, 1939, decedent brought the attorney all the old deeds which he held for the properties and a map of the land portraying the portions to be divided among the children. On September 12, 1939, decedent and his wife came to the attorney's office and signed the four deeds conveying 5,200 to 5,500 acres to each of the three daughters and over 3,300 acres to the son. Each deed recited that the child should hold the land during the term of his natural life, and at his death the land was to vest in the child's heirs in fee simple. At the time of the signing, decedent appeared to *99 the attorney to be in good physical and mental condition. Although the deeds were signed on September 12, 1939, decedent did not deliver the deeds to the children until December, 1939. Two of the deeds were first recorded on December 8, 1939, and the other two on December 9, 1939. The husband of Mrs. Anderson, one of the daughters, died in 1935. At that time she had three children ranging in ages from 7 to 14 years. Her husband left her no property except the family home in Monticello. Mrs. Anderson did not work. Decedent and her father-in-law contributed to the support of Mrs. Anderson and her family. Decedent contributed $50 a month, the father-in-law contributed $6 weekly. Decedent continued to give Mrs. Anderson the $50 a month until he deeded her one of the four tracts of property in controversy in December, 1939. In 1940 decedent expended $1,300 to build a dwelling on the land in which Mrs. Anderson and the family could live, but he did not furnish her thereafter with any more money for support. Decedent continued, however, to give Mrs. Anderson Christmas and birthday gifts. At the time decedent gave the land to Mrs. Anderson, he told her that he was making the gift so that *100 she would no longer be dependent on him. In 1940 Mrs. Anderson leased the land to her brother-in-law and derived income from it in the amount of $1,200. In 1941 and 1942, Mrs. Anderson worked the land for turpentine and received, after payment of taxes, about $500 for 1941 and $1,200 for 1942. Decedent visited Mrs. Anderson almost daily. Mrs. Leggett, another daughter, and her husband had four children, who in 1939 were between the ages of 3 and 14 years old. During the years 1937, 1938, and 1939 the husband was not regularly employed, and decedent contributed to the support of the family. During the first month and a half of 1940 Mrs. Leggett received approximately $250 for timber cut on the land given her by decedent. At the time of the delivery of the deeds in December, 1939, decedent was close to 67 years old. The land was then worth between $1.50 to $2.00 an acre, or, at the higher valuation, a total of $39,090 for the 19,545 acres conveyed. When the gifts of the four tracts of land were made, decedent retained 4,197 acres of the same type of land worth about $2.00 an acre or $8,394. He also owned his home at Lamont valued at $2,500, land and turpentine leases at Ochlocknee *101 worth approximately $12,000, a mortgage worth $2,000, and cash in the approximate amount of $5,000, or a total of $29,894. In addition, up to the time of decedent's death, the $5,000 cash was increased to at least $35,000 representing cash not connected with the sale of any of decedent's other property. The estate tax return, omitting all the transfers in controversy, still disclosed a gross estate of over $61,000. Moreover, an additional amount of about $24,000 representing life insurance and annuities was includible, but not reported, in the gross estate. The transfers of the four tracts of land in December, 1939 by decedent to his three daughters and son were not made in contemplation of death. 2. For one month in 1940, while decedent was away, the son operated the turpentine business at Ochlocknee, and increased the production of turpentine nearly 50 percent. Decedent then engaged the son to operate the business from 1941 through 1943, agreeing that if the son operated the business on a percentage rate of 10 percent less than that customarily given producers by the owner, decedent, in consideration of such reduced charge, would convey to the son 1,697 acres of timber land *102 near Lamont. The son accepted and undertook to operate the Ochlocknee turpentine business. During 1941 he took 50 percent of the production when normally he, as a producer, would have been entitled to 60 percent, and in 1942 he took 60 percent when normally he should have received 70 percent. Under the agreement, decedent received $1,000 in 1941, $1,300 in 1942, and $1,300 in 1943, or a total of $3,600 more than he would have received had he engaged the son or some other contractor merely to operate the Ochlocknee business. The 1,697 acres of timber land near Lamont was worth $2.00 an acre or $3,394. The son went into possession of the land in 1942. Decedent and his wife signed the deed to the 1,697 acres in August, 1942, and decedent delivered the deed to the son in the latter part of September, 1943. Unlike the gifts of the four tracts by decedent to his children in 1939, the deed to the 1,697 acres was not to the son for life with remainder to his children in fee simple, but to the son himself in fee simple. The transfer of the 1,697 acres by deed delivered to the son in September, 1943 was not made by decedent in contemplation of death; it was given pursuant to a bona fide *103 sale to the son for an adequate and full consideration in money or money's worth. 3. Decedent always gave his three daughters and son Christmas and birthday presents. He usually gave them $100 each on their birthdays and $500 each for Christmas. In April and September, 1943 there were bond drives to purchase United States Savings Bonds. Decedent purchased and gave to each of the children in April, 1943 a bond in the face amount of $500. In September, 1943, he purchased and gave to each of the children a bond in the face amount of $1,000. The $500 bond cost $375 and the $1,000 bond cost $750, a total of $1,125 for the two bonds. Decedent did not give the children any money as gifts in 1943. He told the son and one daughter that he was giving them bonds in lieu of his customary birthday and Christmas presents. The transfers of the United States Savings Bonds to the children in 1943 were not made by decedent in contemplation of death. In the summer of 1943 the son sold on behalf of decedent 500 acres of land at Ochlocknee for the sum of $9,000. This $9,000 was included among the cash listed in the estate tax return and is not in dispute. At the time decedent delivered the deed *104 for the 1,697 acres to the son in the latter part of September of 1943, decedent also delivered deeds to the four children for the other lands and turpentine leases which he owned at Ochlocknee. These transfers were included in the gross estate in the estate tax return, and are not in controversy. Prior to his death, decedent made a deed to his minor son for the remaining 2,500 acres of land which he owned near Lamont. However, decedent never delivered this deed to the minor son. The land was included in the gross estate for estate tax purposes, and is not in dispute. The estate tax return disclosed a gross estate of $61,349.47 and deductions in the amount of $4,060.19. Because of the specific exemptions, no tax was shown to be due. Respondent has assigned a valuation of $81,450 to the alleged transfers in contemplation of death which are in controversy. Petitioner does not challenge respondent's valuation of the property transferred. The gross estate as adjusted by respondent is $174,449.19. Opinion The question in this case is whether the transfers of land and United States Savings Bonds made by decedent in his lifetime to his four children were made in contemplation of *105 death so as to be includible in the gross estate under section 811 (c) of the Internal Revenue Code. The decedent was active up to the time of his death. To all who saw him prior to the summer of 1943, he appeared to be in good physical and mental condition. There were no outward manifestations of poor health or of a heart condition until late in the summer of 1943. He had no last illness but died suddenly. 1. The first group of transfers which respondent seeks to include in the gross estate took place in December, 1939. In that month decedent delivered to each of his three daughters and to his son a deed to separate tracts of timber lands situated near Lamont, Florida. Decedent had planned making these transfers of property in 1938; he reaffirmed his intent to carry out the plan in the early part of 1939, before the medical examination in July. He had expressed his intention of finishing his operations on the land for the year 1939, and of then making the transfers to his daughters and son, before July, 1939. His reasons for making the gifts were a result of the changes in his relationships with his family, occasioned by his second marriage in 1937. He was *106 putting four of his children "on their own feet," so to speak, when he undertook to establish a second home and family for himelf. Two of his daughters needed additional income, and with respect to them, the transfers of the land were intended by the decedent to provide them with some income and homes for life. He had always followed a practice of treating his children equally. When he re-married, the decedent felt that his four adult children should not continue to be dependent upon him, or to look to him for support. The decedent arrived at his intention of making these gifts to his four children at a time when he was in good health, as far as he knew, and was engaged in making a new home for himself. These facts, in our opinion, fail to show that the decedent's motive in making these gifts was induced by the thought of death. The deeds were signed and delivered after the decedent learned that he had developed a heart condition, but we do not think that that knowledge prompted him to make the gifts, or that such knowledge indicates that contemplation of death actuated him. He had made preparations in 1938, a considerable time before his visit to a doctor in July, 1939, for transferring *107 the property by having a division line surveyed. He had discussed the contemplated gifts with his son and his attorney in 1938. Respondent admits on brief that there is no evidence that at the time the gifts were first discussed by the decedent, he was aware of an infirmity or heart condition. The principles to be followed in determining whether gifts have been made in contemplation of death are set forth in United States v. Wells, 283 U.S. 102, 118. "The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, * * *. If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * * It is sufficient if contemplation of death be the inducing cause of the transfer whether or not death is believed to be near." (Italics added.) See also, City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594; Allen v. Trust Company of Georgia, 326 U.S. 630; Estate of Fletcher E. Awrey, 5 T.C. 222, 242; Estate of John Moir, 47 B.T.A. 765. *108 In our opinion, these gifts were not induced by thoughts connected with death; the thought of death was not the controlling motive. The transfers of the property were made to provide independent income for two daughters, and, since property was to be given to them, the transfers to the other two children were made to equalize the gifts among the four children. Also, the transfers were made to solve the bitterness of the children over the decedent's remarriage. These purposes were associated with life. Estate of Nathalie Koussevitsky, 5 T.C. 650; Estate of John Moir, supra; Constance McCormick, 38 B.T.A. 308, 311; Jacob Schneider, 35 B.T.A. 183. The 19,545 acres of land involved in these transfers made in December, 1939, were worth about $2 an acre, or, $39,090. Decedent's son testified that decedent retained an estate of about $30,000 at the time of the gifts. Other evidence indicates that decedent retained property of a considerably greater value. For example, at the time of his death the decedent owned insurance and an annuity of more than $24,000 an item which the son overlooked in his testimony. The son's estimate of his *109 father's worth in 1939, appears to have been an underestimate, judging from cash in 1943 of $35,000 which is not traceable to sales of any other property, and the values ascribed to property for estate tax purposes. Thus it does not appear from the evidence that these gifts constituted about 50 percent of the decedent's worth in 1939. If that were the fact, such fact, in itself, would not compel the conclusion that the transfers were made in contemplation of death. Constance McCormick, supra.
It is held that the four transfers of land in December, 1939, were not made in contemplation of death. Respondent places strong reliance upon Harris Trust & Savings Bank v. United States, 29 Fed. Supp. 876. The facts of that case are distinguishable. In that case, unlike this case, one of the two declared reasons of the decedent for originally considering the transfer of property was to assure adequate management of his property after his death. There remains for consideration the transfer of 1,697 acres of timber land to the son, having a value of $3,394; and the gifts of $1,125 of United States Savings Bonds to each of the four children. These transfers were made *110 in 1943. The decedent died suddenly in October, 1943. It is provided in section 811 (c) that "Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death * * *" 2. It is held that the transfer of the 1,697 acres to the son in September, 1943 was not made in contemplation of death. That transfer comes within the exception stated above, for the evidence shows clearly that it was made under a bona fide sale to the son for an adequate and full consideration in money or money's worth. Also, the acreage transferred was not a material part of the decedent's property. The decedent received $1,000 in 1941; $1,300 in 1942; and $1,300 in 1943; a total of $3,600, out of the turpentine operations carried on for him by his son, which was $3,600 more than he would have received if he had not agreed to convey the land to the son in consideration for the son's reduced charges for operations. That land was worth about $3,400. 3. The United States Savings Bonds were purchased *111 during bond drives in April and September, 1943, and given to each of the four children at the time of the purchases. The decedent stated that he was giving the bonds in lieu of his customary birthday and Christmas gifts. The toal expenditures for the bonds, $6,000 did not represent a material part of decedent's property and worth. These gifts took the place of customary birthday and Christmas gifts, and their purchase was induced by a response to an appeal to patriotism to support bond drives. Decedent did not make other cash gifts to his children in 1943. The motive for making these gifts of bonds was not connected with thoughts of death; thought of death was not the "impelling cause" of the gifts. Petitioner has satisfactorily overcome the statutory presumption that these gifts were made in contemplation of death. Estate of Fletcher E. Awrey, supra; Estate of Nathalie Koussevitsky, supra. Under the above holdings, none of the transfers here involved are includible in the gross estate of the decedent. However, a recomputation of the estate tax under Rule 50 is necessary, for other reasons agreed to by the parties. Decision will be entered under Rule *112 50.